# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MICHAEL RAYMOND HAWKINS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )  1:11CV600 |
| | ) |
| WENDELL HARGRAVE, | ) |
| | ) |
| Respondent.[1] | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) A jury in the Superior Court of Davidson County found Petitioner guilty of two counts of statutory rape and four counts of statutory sexual offense against a 14-year-old victim in cases 04CRS57564-57566, whereupon the trial court entered judgment sentencing Petitioner to two consecutive prison terms of 240 to 297 months. (Id., ¶¶ 1-6; see also Docket Entry 6-4 at 56-58 (jury verdict forms), 61-64 (judgments).) Petitioner appealed, and the North Carolina Court of Appeals found merit to Petitioner's argument of a clerical error in the judgment, but affirmed the judgment on all other grounds. State v. Hawkins, No. COA09-821, 202 N.C. App. 585 (table), 691 S.E.2d 133 (table), 2010 WL 522702

---

[1] Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases, the Petition in this case originally named Sid Harkleroad, then-Administrator of the Marion Correctional Institution, as Respondent. (Docket Entry 1 at 1.) Petitioner is currently housed at the Albemarle Correctional Institution, and Wendell Hargrave currently serves as the Administrator of that facility. See https://www.ncdps.gov (search for Wendell Hargrave) (last performed September 17, 2014). By operation of Federal Rule of Civil Procedure 25(d) (applicable to this proceeding pursuant to Rule 12 of the Rules Governing Section 2254 Cases), Wendell Hargrave thus now appears as Respondent.

(Feb. 16, 2010) (unpublished), <u>review denied</u>, 364 N.C. 244, 698 S.E.2d 662 (2010).

The Superior Court thereafter denied Petitioner's Motion for Appropriate Relief ("MAR") and the North Carolina Court of Appeals declined review. (Docket Entry 1, ¶¶ 10, 11; <u>see also</u> Docket Entry 6-10 (MAR filed by counsel for Petitioner); Docket Entry 6-11 (order denying MAR); Docket Entries 6-12 & 6-14 (certiorari petition and amendment filed by counsel for Petitioner); Docket Entry 6-15 (order denying certiorari).) He then instituted this action. (Docket Entry 1.) Respondent answered (Docket Entry 4) and moved for summary judgment (Docket Entry 5). Petitioner responded in opposition (Docket Entry 7) and Respondent filed a reply (Docket Entry 8). For the reasons that follow, the Court will deny any habeas relief.[2]

## I. FACTUAL BACKGROUND

The North Carolina Court of Appeals summarized the facts underlying Petitioner's convictions as follows:

> In March 2004, L.K. was a fourteen-year-old girl who had been expelled from her middle school for putting whiteboard cleaner into her teacher's coffee. Her parents decided that she would stay with [Petitioner] and his family, who they hoped would be able to discipline L.K. effectively. [Petitioner] was a Master Sergeant in the United States Air Force and lived with his wife and child.
>
> L.K. lived with [Petitioner] and his family from Monday through Friday each week from March through early July 2004. According to L.K., after the first week of her living at [Petitioner's] house, [Petitioner] began to sexually assault her. The first instance of sexual

---

[2] The Parties consented to the disposition of this case by a United States Magistrate Judge. (Docket Entry 11.)

assault occurred one day when L.K. came out of the bathroom upstairs, and [Petitioner], standing in the doorway of his bedroom with a gun, requested that she enter his bedroom. She complied. Once in the bedroom, [Petitioner] pulled down L.K.'s pants and underwear. He forced his penis into her mouth and made her give him oral sex. Then [Petitioner] put his penis into L.K.'s vagina and began to rape her. According to L.K., these events lasted approximately thirty minutes.

L.K. testified that [Petitioner] assaulted her another time on the couch downstairs. Late one night after the family had gone to bed, [Petitioner] returned downstairs where L.K. was sitting on the couch and watching T.V. [Petitioner] then pulled his penis out of his shorts, which L.K. understood to be a command for oral sex because "by this time this [had] happened multiple times." L.K. then performed oral sex on [Petitioner]. Afterwards, [Petitioner] pulled down L.K.'s pants and "stuck his fingers inside" her vagina. He "started moving [his fingers] around inside [L.K.]" for approximately three to four minutes. [Petitioner] then stood with one leg on the floor and knelt on the couch with his other leg. He put his penis into L.K.'s vagina and had sex with her for approximately thirteen to fifteen minutes.

L.K. testified to another instance of sexual assault that occurred in the half-bathroom downstairs. [Petitioner] met her as she was leaving the bathroom and "walked [her] backwards" back into the bathroom. He pulled his penis out of his shorts. L.K. recognized this "command" and testified that she was scared. She performed oral sex on [Petitioner] for approximately four to five minutes.

According to L.K., [Petitioner] also sexually assaulted her on the balcony of his house. He "bent [her] over the balcony" and had anal intercourse with her. L.K. could not recall how long the anal intercourse lasted.

On another night, [Petitioner] made L.K. lay on her back on the floor next to the balcony and pulled down her pants and underwear. {Petitioner] then performed oral sex on L.K. for two to three minutes.

L.K. gave a written statement that she was a virgin before [Petitioner] raped her and that she had not had sex with anyone else during the applicable time period. On 21 July 2008, [Petitioner] was indicted on six counts of first-degree statutory sexual offense and two counts of first-degree statutory rape.

The jury trial lasted from 20 January through 22 January 2009. At trial, L.K. testified that all of these events occurred between March and June 2004. She recalled various details personal to [Petitioner], including that he has several moles on his buttocks and that he keeps lubricant in the top drawer beside his bed. [Petitioner] denied all of the allegations of sexual assault and offered alternative explanations for L.K.'s knowledge of those personal details -- for example, that he had caught L.K. spying on him through the bathroom door once after he had exited the shower. He also noted that he has a prominent surgical scar that L.K. did not recall and that the abnormal curvature of his penis would have made certain sexual positions that L.K. described impossible.

The State presented evidence that on 14 July 2004, L.K.'s hymen was not intact, indicating that some sort of vaginal penetration had occurred prior to that date. [Petitioner] attempted to introduce testimony from a witness ("the proposed witness") who claimed to have had sex with L.K. during the applicable time period. However, after an in camera review of the proposed testimony, the trial court ruled that it was inadmissible based upon the proposed witness's inability to remember exactly when he had had sex with L.K. The trial court also prevented defense counsel from cross-examining L.K. with the proposed witness's information. On 22 January 2009, the jury found [Petitioner] guilty of four counts of sexual offense and two counts of rape but not guilty on the other two counts of sexual offense. [Petitioner] was sentenced to two consecutive terms of 240 to 297 months imprisonment.

Hawkins, 2010 WL 522702, at *1-2.

## II. PETITIONER'S CLAIMS

The Petition identifies three separate grounds for relief. (Docket Entry 1, ¶ 12; Docket Entry 1-1 at 10-24.) Petitioner alleges that (1) the trial court violated his right under the Sixth Amendment's Confrontation Clause by excluding (a) his cross-examination of the victim regarding her sexual history and (b) the testimony of a witness ("R.M.") who claimed to have had sexual intercourse with the victim (Docket Entry 1-1 at 10-12); (2) his

-4-

trial counsel provided ineffective assistance by failing to renew
his request that the trial court allow R.M.'s testimony as an
alternative explanation for a nurse practitioner's testimony that
her examination of the victim was consistent with sexual assault
(id. at 12-14); and (3) his trial counsel performed ineffectively
by failing to assert Petitioner's right to a speedy trial and
failing to move to dismiss the case based on a speedy trial
violation (id. at 14-24).

### III.  HABEAS STANDARDS

The Court "shall entertain an application for a writ of habeas
corpus in behalf of a person in custody pursuant to the judgment of
a State court only on the ground that he is in custody in violation
of the Constitution or laws or treaties of the United States."  28
U.S.C. § 2254(a).  Further, "[b]efore [the] [C]ourt may grant
habeas relief to a state prisoner, the prisoner must exhaust his
remedies in state court.  In other words, the state prisoner must
give the state courts an opportunity to act on his claims before he
presents those claims to [this] [C]ourt in a habeas petition.  The
exhaustion  doctrine  .  .  .  is  now  codified  at  28  U.S.C.
§ 2254(b)(1)."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999);
see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to
have waived the exhaustion requirement . . . unless the State,
through counsel, expressly waives the requirement.").

When a petitioner has exhausted state remedies, this Court
must apply a highly deferential standard of review in connection
with habeas claims "adjudicated on the merits in State court

proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id.[3]  To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000).  A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

---

[3] Petitioner admits that Section 2254(d) applies to his instant claims (see Docket Entry 7 at 2) and does not contend that the state court rulings addressing his claims were "based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d) (see Docket Entry 7 at 2-7).

## IV.  DISCUSSION

### A.  Sixth Amendment Right to Confront Witnesses

In his first ground for relief, Petitioner asserts that the trial court deprived him of his Sixth Amendment right to confront his accuser by (1) denying him the right to cross-examine the victim regarding her sexual history; and (2) excluding the testimony of a witness, R.M., who would have testified that he had engaged in sexual intercourse with the victim.  (Docket Entry 1-1 at 10-12.)  He asserts that North Carolina's rape shield statute, N.C. Gen. Stat. § 8C-1, Rule 412, did not bar the excluded inquiry and evidence, because the statute permits such matters when "offered for the purpose of showing that . . . the acts charged were not committed by the defendant."  (Id. at 11 (citing N.C. Gen. Stat. § 8C-1, Rule 412(b).)  Petitioner contends that the instant case bears substantial similarity to Davis v. Alaska, 415 U.S. 308 (1974), which found the defendant's constitutional right to confront his witnesses "paramount" to the state's policy to protect the anonymity of juvenile offenders, id. at 318-19.

Petitioner's argument implicitly suggests that here, as in Davis, this Court should find his Sixth Amendment right to elicit evidence intended to challenge the credibility of the victim's statement that she was a virgin at the time of Petitioner's first rape, paramount to the state's interest in protecting the victim's privacy under North Carolina's rape shield law.  According to Petitioner, his interest in pursuing such a credibility attack held particular importance because the state based its case "primarily

-7-

on [the victim's] testimony." (Docket Entry 1-1 at 12.)
Petitioner argues that the North Carolina Court of Appeals'
decision finding no error in the exclusion of this line of
impeachment "conflict[s] with and misappl[ies] clearly established
federal law as determined by the United States Supreme Court" in
Davis. (Id.) Petitioner's arguments provide no basis for habeas
relief.

Petitioner raised the substance of this claim on direct appeal
and the North Carolina Court of Appeals denied the claim on the
merits, as follows:

> [Petitioner] first argues that his trial was not fair
> because [Petitioner] was prevented from cross-examining
> his accuser concerning her sexual activity and from
> confronting his accuser with testimony that would impeach
> her testimony. [Petitioner] challenges both the trial
> court's evidentiary ruling that prevented cross-
> examination on this issue and trial counsel's failure to
> renew a motion to admit the testimony of a prospective
> defense witness. We disagree on both points and will
> address them separately.
>
> "Although relevant, evidence may be excluded if its
> probative value is substantially outweighed by the danger
> of unfair prejudice, confusion of the issues, or
> misleading the jury, or by considerations of undue delay,
> waste of time, or needless presentation of cumulative
> evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2003).
> "Whether to exclude evidence under Rule 403 is a matter
> within the sound discretion of the trial court." State
> v. Cotton, 318 N.C. 663, 668, 351 S.E.2d 277, 280 (1987)
> (citing State v. Mason, 315 N.C. 724, 340 S.E.2d 430
> (1986)).
>
> "While a defendant clearly is entitled to cross-examine
> an adverse witness, the scope of that cross-examination
> lies within the 'sound discretion of the trial court, and
> its rulings thereon will not be disturbed absent a
> showing of abuse of discretion.'" State v. Dorton, 172
> N.C. App. 759, 766, 617 S.E.2d 97, 102 (2005) (quoting
> State v. Herring, 322 N.C. 733, 743-44, 370 S.E.2d 363,
> 370 (1988)). "When cross-examination involves the sexual

behavior of the complainant, our Rape Shield Statute further limits the scope of cross-examination by declaring such examination to be irrelevant to any issue in the prosecution except in four very narrow situations." Id. (internal citations and quotation marks omitted).

North Carolina Rules of Evidence, Rule 412(b) ("Rule 412") provides:

> Notwithstanding any other provision of law, the sexual behavior of the complainant is irrelevant to any issue in the prosecution unless such behavior:
>
> (1) Was between the complainant and the defendant; or
>
> (2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant; or
>
> (3) Is evidence of a pattern of sexual behavior so distinctive and so closely resembling the defendant's version of the alleged encounter with the complainant as to tend to prove that such complainant consented to the act or acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented; or
>
> (4) Is evidence of sexual behavior offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act or acts charged.

N.C. Gen. Stat. § 8C-1, Rule 412(b) (2003).

In the instant case, the trial court conducted an in camera hearing to determine whether the proposed testimony and line of questioning with respect to L.K.'s sexual activity were admissible pursuant to Rule 412. Defense counsel offered the evidence for purposes of impeaching L.K.'s testimony that she was a virgin prior to March 2004. However, during the hearing, the proposed witness was unable to state with confidence that he had engaged in sexual intercourse with L.K. before March of 2004. This lack of certainty diminished both the relevance and the probative value of the proposed

> witness's testimony and provided a reason for the trial
> court to exercise its discretion by excluding the offered
> evidence. Accordingly, the trial court did not abuse its
> discretion by excluding the proposed witness's uncertain
> testimony and by preventing cross-examination of L.K.
> using information from the proposed witness.

Hawkins, 2010 WL 522702, at *2-3.

As acknowledged by Petitioner (see Docket Entry 7 at 2), because the state court adjudicated Petitioner's claim on the merits, this Court must apply § 2254(d)'s deferential standard of review and thus first must decide whether "clearly established federal law, as determined by the Supreme Court of the United States" exists to establish the contours of Petitioner's right under the Confrontation Clause in this context, 28 U.S.C. § 2254(d)(1).[4] As noted above, Petitioner argues that the Supreme Court's decision in Davis supplies the requisite "clearly established federal law." (Docket Entry 1-1 at 10-12.) The Court disagrees and finds that Davis does not provide any "governing legal principles" to apply under the facts of the instant case. See Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (holding that to

---

[4] The deferential standard of review under § 2254(d) applies even where the state court did not cite federal law in its decision on the merits. Early v. Packer, 537 U.S. 3, 8 (2002) ("[T]he Ninth Circuit observed that the state court failed to cite any federal law, much less the controlling Supreme Court precedents. If this meant to suggest that such citation was required, it was error. . . . [The standard set forth in Section 2254(d)] does not require citation of [Supreme Court] cases – indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." (internal citation, ellipses, emphasis, and quotation marks omitted)); Barbe v. McBride, 521 F.3d 443, 456 n.19 (4th Cir. 2008) ("[I]t was not necessary . . . for the state circuit court to consider [specific United States Supreme Court] decisions (or any other applicable federal precedent in order to refrain from an unreasonable application of federal law. . . . And, in assessing the [federal] claim, the [state] circuit court was entitled to look to, for example, the state authorities cited by [the petitioner]."); Hill v. Ozmint, 339 F.3d 187, 196 (4th Cir. 2003) (rejecting "conten[tion] that, because the state court referenced only state law in resolving [a federal] claim, it failed to 'adjudicate' it 'on the merits'").

constitute "clearly established federal law," Supreme Court precedent must provide "governing legal principle" for lower courts to follow (citing <u>Williams</u>, 529 U.S. at 405, 412-13)).

The United States Court of Appeals for the Fourth Circuit addressed the extent to which <u>Davis</u> provided clearly established federal law in <u>Quinn v. Haynes</u>, 234 F.3d 837 (4th Cir. 2000). In <u>Quinn</u>, the court held that <u>Davis</u> and its progeny did not constitute clearly established federal law on the matter before the court because those cases analyzed "the Confrontation Clause implications of excluding cross-examination on bias and motive to fabricate charges" as opposed to general impeachment of credibility and because they involved "impeachment based upon credibility-impugning facts that were not in dispute." <u>Id.</u>, 234 F.3d at 844-46. The court concluded that, "[t]o the extent that the <u>Davis</u> . . . line of cases leaves open the issue of a defendant's right to impeach the general credibility of a witness regarding a contested fact, those cases certainly do not 'clearly establish' [the petitioner's] asserted Sixth Amendment right." <u>Id.</u> at 846.

As in <u>Quinn</u>, Petitioner here did not seek to cross-examine the victim and introduce R.M.'s testimony to elicit the victim's bias or a motivation to fabricate the rape charges, but rather to attack the credibility of the victim's statement that she was a virgin at the time of Petitioner's sexual assault. (Docket Entry 1-1 at 6, 7; Docket Entry 7 at 2-4.) Moreover, in contrast to <u>Davis</u>, the parties here dispute the "credibility-impugning" fact, i.e., that the victim had engaged in sexual intercourse with R.M.

prior to March 2004 when the victim alleged Petitioner sexually assaulted her. Therefore, Davis does not control this case.

Respondent agrees that Davis does not constitute clearly established federal law for purposes of resolving petitioner's first ground for relief. (See Docket Entry 6 at 7, 9.) However, Respondent then impliedly asserts that no clearly established federal law exists to govern resolution of this case. (See id. at 9 (citing Carey v. Musladin, 549 U.S. 70 (2006), for the proposition that "a state court cannot be said to have unreasonably applied clearly established federal law under section 2254(d)(1) when there are no holdings from the Supreme Court addressing the issue raised by the petitioner" (emphasis added)).) Fourth Circuit precedent belies Respondent's position on that point.

The Fourth Circuit ultimately concluded that clearly established federal law as determined by the United States Supreme Court does exist to provide governing legal principles in Confrontation Clause challenges of the sort at issue here. First, Quinn thoroughly discussed the Supreme Court's Sixth Amendment jurisprudence as follows:

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has made clear that the right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, see Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), "means more than being allowed to confront the witness physically," Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Indeed, the [Supreme] Court has noted that "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of

cross-examination.'" Id. at 315-316, 94 S. Ct. 1105 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). Accordingly, it is clear from Supreme Court precedent that the Sixth Amendment guarantees the right of a criminal defendant to reasonable cross-examination, when otherwise appropriate, for the purpose of impeaching the credibility of key witnesses. See Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988); Davis, 415 U.S. at 315-16, 94 S. Ct. 1105. It does not follow, however, that the Confrontation Clause of the Sixth Amendment prevents a trial court from imposing any limits on the scope of defense counsel's cross-examination and presentation of evidence related to the impeachment of a key prosecution witness's credibility. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

In the exercise of his Confrontation Clause rights, [a criminal defendant] must "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." See Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). In other words, the Confrontation Clause does not trump established rules of evidence, but rather must yield to such rules when their application is reasonable. See Taylor v. Illinois, 484 U.S. 400, 410-11, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) ("The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on that right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments . . ..")

. . .

The United States Supreme Court has held that numerous state procedural and evidentiary rules control the presentation of evidence and do not offend a defendant's Sixth Amendment Confrontation Clause right. See, e.g., Michigan v. Lucas, 500 U.S. 145, 149-51, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991) (upholding the notice-and-hearing provisions of Michigan's rape shield law)[.]

. . .

> In light of the fact that evidentiary rules inevitably
> limit the scope and nature of any criminal defense, the
> Supreme Court has established an analytical framework
> that courts should use when evaluating Confrontation
> Clause challenges based upon the exclusion of evidence.
> Pursuant to this framework, courts must determine whether
> the rule relied upon for the exclusion of evidence is
> "arbitrary or disproportionate" to the "State's
> legitimate interests." Lucas, 500 U.S. at 151, 111 S.
> Ct. 1743; see also Rock v. Arkansas, 483 U.S. 44, 55, 107
> S. Ct. 2704, 97 L. Ed. 2d 37 (1987) ("[R]estrictions of
> a defendant's right to testify may not be arbitrary or
> disproportionate to the purposes they are designed to
> serve. In applying its evidentiary rules a State must
> evaluate whether the interests served by a rule justify
> the limitation imposed on the defendant's constitutional
> right to testify.").

Quinn, 234 F.3d at 847-49.

Building on its conclusion in Quinn that Rock and Lucas provided an "analytical framework that courts should use when evaluating Confrontation Clause challenges based upon the exclusion of evidence," Quinn, 234 F.3d at 848-49, the Fourth Circuit clarified in 2008 that said cases did, in fact, constitute "clearly established federal law" in the context of challenges akin to Petitioner's first ground for relief:

> We now reiterate that the Rock-Lucas Principle
> constitutes clearly established federal law determined by
> the Supreme Court of the United States. The Rock-Lucas
> Principle clearly mandates that a state court, in ruling
> on the admissibility of evidence under a rape shield law,
> must eschew the application of any per se rule in favor
> of a case-by-case assessment of whether the relevant
> exclusionary rule "is 'arbitrary and disproportionate' to
> the State's legitimate interests." Lucas, 500 U.S. at
> 1512, 111 S. Ct. 1743 (quoting Rock 483 U.S. at 56, 107
> S. Ct. 2704).

Barbe v. McBride, 521 F.3d 443, 458 (4th Cir. 2008). Other circuit courts of appeals similarly have applied the Rock-Lucas Principle to analyze whether evidentiary exclusions violated the

Confrontation Clause. See, e.g., Batey v. Haas, ___ F.3d ___, 2014 WL 3562736, at *3 (6th Cir. 2014) ("To show that a judge has exceeded [the wide] latitude [he or she possesses to impose reasonable limits on a defendant's cross-examination] in the context of an as-applied challenge to the scope of cross-examination on Confrontation Clause grounds, the litigant must show that the exclusion of the testimony was 'arbitrary or disproportionate' to its purposes."); Sussman v. Jenkins, 636 F.3d 329, 353-54 (7th Cir. 2011) ("In a criminal case, restrictions on the defendant's rights to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the purposes they are designed to serve."); White v. Coplon, 399 F.3d 18, 24 (1st Cir. 2005) (concluding that Rock and Lucas "call[] for a balancing of interests depending on the circumstances of the case"). Accordingly, the Court will assess whether the North Carolina Court of Appeals ruled contrary to or unreasonably applied the Rock-Lucas Principle in affirming the trial court's exclusion of Petitioner's proffered cross-examination and impeachment evidence.

The Fourth Circuit further instructed that courts should consider three "relevant factors . . . in conducting the Rock-Lucas assessment: (1) the strength vel non of the state's interests that weigh against admission of the excluded evidence; (2) the importance of the excluded evidence to the presentation of an effective defense; and (3) the scope of the evidence ban being applied against the accused." Barbe, 521 F.3d at 458 (internal

-15-

citations omitted).  Applying these factors, the Court concludes that the North Carolina Court of Appeals did not contradict or unreasonably apply the Rock-Lucas Principle when it affirmed the trial court's application of the state rape shield statute.

First, regarding the strength of the state's interest in excluding Petitioner's proposed impeachment, the United States Supreme Court in Lucas recognized that rape shield statutes serve the legitimate state interest of protecting victims of sexual crimes from harassment, humiliation, and "unnecessary invasions of privacy."  Lucas, 500 U.S. at 150.  As acknowledged by the Fourth Circuit, "a state's interest in protecting sexual abuse victims is especially compelling when the testifying victim is a child, in that questioning about sexual conduct is potentially 'more psychologically damaging' to children."  Barbe, 521 F.3d at 459 n.21 (citing Quinn, 234 F.3d at 850).  In addition, such statutes "encourage the victims of sexual misconduct to institute and participate in legal proceedings against sexual offenders."  Id. at 459 (citing Fed. R. Evid. 412 advisory committee's note).  These compelling state interests weighed in favor of the exclusion ordered in this case and thus support a finding that the North Carolina Court of Appeals did not act contrary to or unreasonably apply the Rock-Lucas Principle in affirming the trial court's evidentiary ruling.

Second, the record does not reflect that the proffered impeachment held significant importance to Petitioner's ability to present an effective defense.  Petitioner sought to attack the

credibility of the victim's statement that she maintained her virginity until Petitioner's sexual assault. However, as the North Carolina Court of Appeals observed in the above-quoted excerpt, the excluded inquiry and evidence lacked probative value on point. Although R.M. testified during an <u>in camera</u> offer of proof that he had sexual intercourse with the victim, R.M. could not recall <u>when</u> that intercourse took place:

Q:    . . . [D]o you know [the alleged victim]?

A:    Yes, I do . . . From school . . . Randleman Middle School . . . I know her like pretty good.  We used to hangout all the time.

Q:    Was there ever an occasion that you had sex with [the alleged victim]?

A:    Yes, sir.

Q:    . . . Did you insert your penis in her vagina?

A:    Yeah . . . Four or five years ago, long time ago . . . I remember her being expelled from school for poisoning a teacher.

Q:    Did you have sex with her before that?

A:    I don't remember.  It has been a long time ago.

Q:    Did you tell my investigator that you had sex with her before she was expelled?

A:    It might have been . . . Yeah, I think it was before.

[PROSECUTOR]: Objection, your Honor.

THE COURT:    Sustained to what he thinks.

A:    It has been a long time ago.  I can't remember if it was before or after.  I'm  pretty sure it was before because-

[PROSECUTOR]: Objection.

THE COURT:      Sustained to what he thinks.

A:   Yeah, I think it was before she got expelled from
     school.

[PROSECUTOR]: Objection to what he thinks.

THE COURT:      Sustained to what he thinks.

A:   . . . To be honest, I don't remember if it was
     before or after.

Q:   Was she still in school at the time that you had
     sex with her, and when I say that, I mean Randleman
     Middle School?

A:   Yes, sir . . . I dropped out and went to RCC and
     got GED after that . . . I never went back to
     school or anything.  I didn't know if she went back
     or not.

Q:   . . . At the time that you had sex with [the
     alleged victim] was she still in school at
     Randleman Middle School?

A:   I don't remember, sir.

(Docket Entry 6-5 at 15-17 (quoting In Camera Tr. 140-44) (ellipses
as they appear in Petitioner's quotation of this testimony in his
appellate brief).)[5]

     As recognized by the North Carolina Court of Appeals in
denying Petitioner's challenge to the trial court's ruling, R.M.'s
"lack of certainty diminished both the relevance and the probative
value of the proposed witness's testimony and provided a reason for
the trial court to exercise its discretion by excluding the offered
evidence."  Hawkins, 2010 WL 522702, at *2-3.  Without reliable
testimony regarding the timing of this alleged intercourse, i.e.,
whether it occurred prior to Petitioner's sexual assault of the

_____

     [5]  The parties have not submitted a copy of the in camera transcript to
this Court.

victim, the evidence had little probative value to disprove the victim's statement that she maintained her virginity until Petitioner's assault.

In addition, the victim disputed the alleged "credibility-impugning fact," Quinn, 234 F.3d at 846. In both her statement to detectives and her testimony during the in camera hearing, the victim denied that she had ever engaged in sexual intercourse with R.M. (Docket Entry 6-4 at 29; Docket Entry 6-5 at 17 (quoting In Camera Tr. 129).) Thus, the instant case stands in stark contrast to cases in which courts on post-conviction review found Confrontation Clause violations from the exclusion of undisputed evidence of past sexual activity. See Barbe, 521 F.3d at 446 & n.5, 458-60 (finding Confrontation Clause violation in application of rape shield law to exclude undisputed evidence that victim had made prior sexual abuse allegations); Taque v. Richards, 3 F.3d 1133, 1136, 1138 (7th Cir. 1993) (ruling that Confrontation Clause required allowance of the defendant's cross-examination of doctor regarding undisputed fact that victim had disclosed prior abuse by another person); see also Persinger v. McBride, at *16-20 (S.D.W. Va. Sept. 15, 2005) (unpublished) (finding no Confrontation Clause error where trial court excluded under rape shield law evidence of victim's past sexual abuse but permitted parties to stipulate to jury that such abuse took place prior to defendant's alleged abuse of victim). In sum, the second factor identified in Barbe for assessment of a state court's adherence to the Rock-Lucas Principle favors the exclusion of Petitioner's proffered impeachment (and

thus undermines any argument that the North Carolina Court of Appeals ruled contrary to or unreasonably applied the Rock-Lucas Principle when it affirmed the trial court's application of the rape shield law).

Third, in light of the evidence Petitioner presented at trial, the scope of the evidentiary restriction imposed did not unreasonably prevent Petitioner from impeaching the credibility of the victim. Here, the trial court permitted Petitioner's counsel to cross-examine the victim at length regarding matters that called into question her truthfulness and reliability. (Docket Entry 16-6 at 87-93; Docket Entry 16-7; Docket Entry 16-8 at 1-18, 20.) In addition, Petitioner testified in his own defense and called six witnesses – two of the victim's seventh grade teachers, the victim's mental health counselor, a resource officer at the victim's middle school, the victim's middle school principal, and Petitioner's wife – all of whose testimony called into doubt in various ways the credibility of the victim. (Docket Entry 16-20 at 28-73, Docket Entry 16-21 at 1-43, 52-56; Docket Entry 16-22 at 1-7.) Under such circumstances, the scope of the evidentiary ban in this matter did not shut down Petitioner's ability to impeach the victim and, thus, this factor does not weigh in favor of Petitioner. See Batey, 2014 WL 3562736, at *4 (finding no Confrontation Clause violation where, inter alia, the defendant otherwise "thoroughly impeached" the witnesses "with their mental instability" and "penchant for lies"); Quinn, 234 F.3d at 850-51 (noting significance under Rock-Lucas analysis that trial court

allowed the defendant to impeach the victim's credibility through testimony of other witnesses).

All three of the factors identified by the Fourth Circuit as relevant to the Rock-Lucas assessment support the trial court's evidentiary rulings at issue. As such, the Court concludes that the North Carolina Court of Appeals did not contradict or unreasonably apply the Rock-Lucas Principle when it affirmed the trial court's application of the state rape shield law.

**B. Ineffective Assistance of Trial Counsel Based on Failure to Renew Request to Admit R.M.'s Testimony**

Next, Petitioner asserts that the North Carolina Court of Appeals contradicted and/or unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984) in denying his claim for ineffective assistance of trial counsel. (Docket Entry 1-1 at 12-14.) Specifically, Petitioner contends that his trial counsel's performance fell below an objective standard of reasonableness when trial counsel failed to renew his request that the trial court allow R.M.'s testimony following the nurse practitioner's testimony. (Id. at 13-14.) Petitioner maintains that R.M.'s testimony would have provided an alternative explanation to the nurse's testimony regarding the state of the victim's hymen and cites State v. Ollis, 318 N.C. 370, 376, 348 S.E.2d 777, 781 (1986), and State v. Wright, 98 N.C. App. 658, 662, 392 S.E.2d 125, 128 (1990), as support for the admissibility and importance of evidence providing an alternative explanation for a sexual assault victim's physical condition. (Docket Entry 1-1 at 13-14.)

Petitioner conclusorily claims prejudice, i.e., that had the jury heard the excluded evidence, they "would have acquitted [Petitioner] of all charges." (<u>Id.</u> at 14.) These arguments provide no basis for habeas relief.

Petitioner raised the substance of this claim on direct appeal and the North Carolina Court of Appeals denied the claim on the merits as follows:

> The second part of [Petitioner's] first argument is that defense counsel at the trial level rendered ineffective assistance by failing to renew a motion to admit the proposed testimony. We disagree.
>
> "When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." <u>State v. Braswell</u>, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, 693 (1984)). Our Supreme Court has adopted from <u>Strickland</u> the two-part test for ineffective assistance of counsel:
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, <u>a trial whose result is reliable</u>. (Emphasis added).
>
> <u>Id.</u> at 562, 324 S.E.2d at 248 (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, 693 (1984)).
>
> Here, defense counsel's decision not to renew the motion to admit testimony from the proposed witness was reasonable considering that the proposed witness was unable to remember exactly when he had engaged in sexual intercourse with L.K. Both the relevance and the probative value of the proposed testimony depend on the

-22-

time period.  Having heard during the in camera hearing that the proposed witness could not recall when the sexual encounter took place, defense counsel acted reasonably –– and not deficiently -- by deciding not to renew the motion.  Because counsel acted reasonably, we do not address the second prong of the <u>Strickland</u> test. We hold that trial counsel's performance did not constitute ineffective assistance.

<u>Hawkins</u>, 2010 WL 522702, at *3-4.

In light of that adjudication on the merits (and, as conceded by Petitioner (<u>see</u> Docket Entry 7 at 2)), Section 2254(d)'s highly deferential standard governs this Court's review of Petitioner's instant parallel claim and the Court thus must consider whether the North Carolina Court of Appeals contradicted or unreasonably applied clearly established federal law.  The Fourth Circuit has provided guidance in regards to the clearly established law governing ineffective assistance claims:

In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [<u>Strickland</u>, 466 U.S. at 688], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id.</u> at 687.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be

-23-

considered sound trial strategy." Id. (internal
quotation marks omitted).

Similarly, in evaluating whether [a petitioner] has shown
actual prejudice from any such deficient performance, it
is insufficient for the [petitioner] "to show that the
errors had some conceivable effect on the outcome of the
proceeding," because "[v]irtually every act or omission
of counsel would meet that test." Id. at 693. Rather,
a "reasonable probability" that the result would have
been different requires "a probability sufficient to
undermine confidence in the outcome." Id. at 694. When
challenging a conviction, "the question is whether there
is a reasonable probability that, absent the errors, the
factfinder would have had a reasonable doubt respecting
guilt." Id. at 695.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (internal

parallel citations omitted).

Moreover, the United States Supreme Court has cautioned that

"[s]urmounting Strickland's high bar is never an easy

task. . . . Even under *de novo* review, the standard for judging

counsel's representation is a most deferential one." Harrington v.

Richter, 562 U.S. 86, ___, 131 S. Ct. 770, 788 (2011) (internal

quotation marks omitted). Further, "[w]here the issue is whether

the state court has unreasonably applied Strickland standards to a

claim of ineffective assistance of counsel, . . . double deference

is required . . . ." Lavandera-Hernandez v. Terrell, No.

1:12-cv-553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013)

(Schroeder, J.) (unpublished) (internal quotation marks omitted),

appeal dismissed, 539 F. App'x 159 (4th Cir. 2013); see also

Harrington, 562 U.S. at ___, 131 S. Ct. at 788 ("The standards

created by Strickland and § 2254(d) are both highly deferential and

when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)).

Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 526 U.S. at ___, 131 S. Ct. at 788; see also Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (observing that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In other words, "under the dual, overlapping lenses of [Section 2254(d)] and Strickland [the Court must] ask[] the following question: Was the [North Carolina Court of Appeal]'s holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" Moore v. Hardee, 723 F.3d 488, 496 (4th Cir. 2013) (internal brackets, ellipses, and quotation marks omitted).

Under this standard, the Court concludes that the North Carolina Court of Appeals' denial of this ineffective assistance claim did not contradict or unreasonably apply Strickland. Petitioner's argument suggests that the nurse practitioner's testimony regarding the state of the victim's hymen significantly impacted the admissibility of the excluded evidence, triggering a

duty on trial counsel's part to renew his evidentiary proffer. (Docket Entry 1-1 at 12-14.) Although the nurse practitioner's testimony provided Petitioner with another basis on which to argue for the admission of the excluded evidence, i.e., that sexual intercourse with R.M. may have explained the victim's physical condition, the fundamental defect in the proffered evidence remained: R.M. could not state with any certainty when he had sexual intercourse with the victim.[6] As the Court of Appeals observed, "[b]oth the relevance and the probative value of the proposed testimony depend on the time period." Hawkins, 2010 WL 522702, at *4. Given R.M.'s uncertainty, the Court of Appeals' decision that Petitioner's trial "counsel acted reasonably -- and not deficiently" in opting against renewing his motion to admit R.M.'s testimony rests, at a minimum, on a "reasonable argument that counsel satisfied Strickland's deferential standard," Harrington, 526 U.S. at ___, 131 S. Ct. at 788. Petitioner's instant claim therefore fails as a matter of law. See Strickland, 466 U.S. at 697 ("[T]here is no reason . . . to address both

_____

[6] The Court deems the Ollis and Wright decisions relied on by Petitioner inapposite for two reasons. First, although in each case a North Carolina appellate court found error in the exclusion under the rape shield statute of evidence of prior sexual activity, neither case involved any doubt about the timing of that sexual activity. Ollis, 318 N.C. at 371-72, 376, 348 S.E.2d at 778-79, 781 (ruling admissible evidence of sexual abuse occurring prior to and in immediate time frame of underlying assaults); Wright, 98 N.C. App. at 659-60, 662, 392 S.E.2d at 126-28 (reversing trial court's exclusion of evidence that victim had masturbated for at least six years predating the assault in question). Second, neither case addresses the admissibility of this evidence in the context of ineffective assistance of counsel claims brought on collateral review in federal court. Without analysis under the double deference of Section 2254(d) and Strickland, those cases do not support Petitioner's second ground for relief.

-26-

components of the [performance and prejudice] inquiry if the defendant makes an insufficient showing on one.").

## C. Ineffective Assistance of Trial Counsel Based on Failure to Assert Speedy Trial Rights

Finally, Petitioner contends that his trial counsel provided ineffective assistance by failing to assert Petitioner's Sixth Amendment speedy trial rights during a delay of more than four years between his arrest and his trial, as well as by failing to file a motion to dismiss the case based upon the speedy trial violation. (Docket Entry 1-1 at 14-24.) Petitioner relies on Standard 4-3.6 of the Standards for Criminal Justice published by the American Bar Association ("ABA")[7] and the United States Supreme Court's "four-factor balancing test" in Barker v. Wingo, 407 U.S. 514, 530-33 (1972), to argue that his case met all the criteria for a dismissal based upon a speedy trial violation. (Id. at 16-23.)

Petitioner raised a nearly identical claim in his MAR. (Docket Entry 6-10), which claim the MAR court thereafter summarily denied (Docket Entry 6-11). Because the MAR court adjudicated that claim on the merits, in addition to the deference generally applicable to performance by counsel, see Harrington, 526 U.S. at ___, 131 S. Ct. at 788, Section 2254(d)'s "highly deferential standard" governs this Court's review of Petitioner's instant

---

[7] That standard provides, in pertinent part: "Many important rights of the accused can be protected and preserved only by prompt legal action. Defense counsel should inform the accused of his or her rights at the earliest opportunity and take all necessary action to vindicate such rights. Defense counsel should consider all procedural steps which in good faith may be taken, including . . . seeking dismissal of the charges." Standard 4-3.6, Standards for Criminal Justice (ABA 3d ed. 1993).

parallel claim. <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398.[8]
Accordingly, in this context, "[t]he pivotal question is whether
the state court's application of the <u>Strickland</u> standard was
unreasonable." <u>Harrington</u>, 526 U.S. at ___, 131 S. Ct. at 786.
Petitioner has not made that showing.

At the outset, the Court notes that, although the ABA
Standards for Criminal Justice provide some guidance as to the
professional norms governing a criminal defense attorney's
performance, they do not control, as the United States Supreme
Court has made clear:

> Prevailing norms of practice as reflected in American Bar
> Association standards and the like, e.g., ABA Standards
> for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The
> Defense Function"), are guides to determining what is
> reasonable, but they are only guides. No particular set
> of detailed rules for counsel's conduct can
> satisfactorily take account of the variety of
> circumstances faced by defense counsel or the range of
> legitimate decisions regarding how best to represent a
> criminal defendant. Any such set of rules would
> interfere with the constitutionally protected
> independence of counsel and restrict the wide latitude
> counsel must have in making tactical decisions. Indeed,
> the existence of detailed guidelines for representation
> could distract counsel from the overriding mission of
> vigorous advocacy of the defendant's cause.

<u>Strickland</u>, 466 U.S. at 688-89 (internal citation omitted); <u>see
also</u> <u>Yarbrough v. Johnson</u>, 520 F.3d 329, 339 (4th Cir. 2008)
(holding that "[r]ecognition of the ABA Guidelines as the minimum
prevailing community standard would transform defense lawyers'
judgments into mindless defensive reactions to a potential habeas

---

[8] Again, Petitioner does not contest the applicability of Section 2254(d)
(<u>see</u> Docket Entry 7 at 2), with good reason, <u>see</u> <u>Cullen</u>, ___ U.S. at ___, 131 S.
Ct. at 1402 ("Section 2254(d) applies even where there has been a summary
denial.").

claim, divorced from the individualized needs of professional representation"). Moreover, Petitioner has made no meaningful attempt to show how Standard 4-3.6 of the ABA Standards for Criminal Justice supports his second ground for relief under the particular facts of this case. (<u>See</u> Docket Entry 1-1 at 16-23; Docket Entry 7 at 6-7.)

Under these circumstances, the Court will focus on the <u>Barker</u> factors, <u>see</u> <u>Ricon v. Garrison</u>, 517 F.2d 628, 631 (4th Cir. 1975) (describing <u>Barker</u> as "the authoritative decision" on the speedy trial right), i.e., (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) prejudice to the defendant. <u>Barker</u>, 407 U.S. at 522, 530–32. For purposes of gauging the length of the delay, the speedy trial right is "triggered by arrest, indictment, or other official accusation." <u>Doggett v. United States</u>, 505 U.S. 647, 655 (1992). Here, the time between Petitioner's arrest on July 13, 2004, and his trial on January 20, 2009, exceeded four and a half years. A delay of such length requires consideration of the remaining <u>Barker</u> factors. <u>See</u> <u>Ricon</u>, 517 F.2d at 632-33 (finding 36-month delay substantial enough to "to act as a triggering mechanism to require inquiry into the other [<u>Barker</u>] factors" (internal quotation marks omitted)).

Regarding the reason for the delay, the record reflects no explanation, but each side <u>speculates</u> that the other occasioned the delay. For example, although Petitioner concedes that the record does not indicate "that the State acted wilfully or deliberately in

-29-

delaying [Petitioner's] trial," he declares that "[t]he fact that the State sought superseding indictments on July 21, 2008, however, suggests that the delay was attributable to the State's negligence in failing to secure such indictments at an earlier time." (Docket Entry 1-1 at 19 (emphasis added).) Respondent, for his part, posits that delay represented a defense strategy: "As this Court is aware, lengthy delay of a trial while hoping that the government's witnesses scatter and evidence will be lost, is a well-known defense strategy. In the case at bar, it was likely the only real chance Petitioner had to obtain an acquittal." (Docket Entry 6 at 13.) Neither side has identified any record support for their positions.[9] Because of the record's silence regarding a cause for the delay, this factor weighs in favor of Petitioner, "but not heavily" so. See Goodrum v. Quarterman, 547 F.3d 249, 258 (5th Cir. 2008) (finding "unexplained or negligent delays . . . weigh against the state, but not heavily"); Ricon, 517 F.2d at 633 ("In the absence of any explanation by the State for its sloth, the conclusion that simple neglect or perhaps an overcrowded docket was the reason for the delay in this case is plausible. Such a delay, though more 'neutral' than intentional delays, is still viewed with disfavor but is not heavily weighed in the balancing test.")

---

[9] Petitioner's Affidavit, submitted as an attachment to his MAR, merely states that, "[t]o [his] knowledge, [his trial counsel] did not ever move to continue [Petitioner's] case." (Docket Entry 6-10 at 30.) Given the absence of any evidence that the state ever moved for a continuance of the trial either, Petitioner's equivocal statement carries little significance. See Wright v. Cockrell, No. Civ.A.4:03CV058-A, 2003 WL 21673538, at *4 (N.D. Tex. Jul. 14, 2003) (unpublished) (noting that, because the record did "not reflect that the state at any time requested a continuance in the case," the reason for the delay factor did "not necessarily weigh[] heavily against the state").

The Court must now consider whether Petitioner asserted his speedy trial right at any time during the delay. Petitioner concedes that he "did not formally assert his right to a speedy trial." (Docket Entry 1-1 at 20.) However, Petitioner avers that he "repeatedly told [counsel] that he did not want a delay in his case" and "constantly asked [counsel] why it was taking so long for [his] case to be called for trial," but that counsel "was unable to provide an answer," "often told [Petitioner] he did not know why," and "assured [Petitioner] that [he] should not worry about it." (Docket Entry 6-10 at 30-31.) Petitioner's statements to counsel do "not appear to be an outright assertion of his right to a speedy trial." Bates v. Carlton, No. 2:09-CV-120, 2012 WL 3524901, at *13 (E.D. Tenn. Aug. 14, 2012) (unpublished). Further, given Petitioner's report as to the nature of his counsel's responses to Petitioner's inquiries, if Petitioner had truly wanted a speedy trial, he "likely would have understood that he needed to initiate further contact with counsel on this subject, and instruct counsel to make a speedy trial motion." Id. Nothing appears in the record to show that Petitioner "pressed counsel to take any further action with respect to a speedy trial motion." Id. Accordingly, this factor weighs against Petitioner.

Lastly, the Court must address the degree to which the delay in this case prejudiced Petitioner. In regard to prejudice, the United States Supreme Court has explained the following:

> We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive

> pretrial incarceration," "anxiety and concern of the
> accused," and "the possibility that the [accused's]
> defense will be impaired" by dimming memories and loss of
> exculpatory evidence. Barker, 407 U.S. at 532; see also
> Smith v. Hooey, 393 U.S. 374, 377–79 (1969); United
> States v. Ewell, 383 U.S. 116, 120 (1966). Of these
> forms of prejudice, "the most serious is the last,
> because the inability of a defendant adequately to
> prepare his case skews the fairness of the entire
> system." [Barker,] 407 U.S. at 532.

Doggett, 505 U.S. at 654 (internal parallel citations omitted).

"The burden of establishing prejudice rests on the petitioner."

Ricon, 517 F.2d at 634. Although a petitioner need not demonstrate

actual prejudice, he or she must, at a minimum, establish "the

credible possibility of prejudice." Id.

Here, Petitioner argues that he suffered prejudice in three

ways.[10] Primarily, he alleges that, as a result of the delay, his

witness R.M. could no longer recall when he had sexual intercourse

with the victim, which led the trial court to exclude R.M.'s

testimony as unreliable. (Docket Entry 1-1 at 21-22.) As

discussed above, Petitioner sought to introduce R.M.'s testimony to

attack the credibility of the victim's statement that she was a

virgin at the time of Petitioner's first sexual assault. In

addition, Petitioner asserts that he suffered economic hardship

because the Air Force placed his job as a recruiter on

"administrative hold" pending resolution of the charges, which

reduced his income by $450 per month, precluded certain work

assignments, lessened his chances of promotion, and curtailed his

---

[10] As Petitioner remained free on bond during the time between July 23, 2004 (ten days after his arrest) and the time of his trial (see Docket Entry 6-10 at 30), Petitioner does not assert the oppression of pretrial incarceration as a form of prejudice arising from the delay (Docket Entry 1-1 at 20-22).

eligibility for retirement benefits. (Docket Entry 1-1 at 21; Docket Entry 6-10 at 31-32.) Finally, Petitioner attests that he suffered anxiety and marital difficulties over the long-pending criminal charges. (Docket Entry 1-1 at 21; Docket Entry 6-10 at 32-33.) Petitioner's allegations fail to establish a "credible possibility of prejudice." Ricon, 517 F.2d at 634.

As an initial matter, the United States Supreme Court has cautioned that the "possibility of prejudice" arising from the fading memory of a witness generally does not suffice to support a speedy trial claim. United States v. Loud Hawk, 474 U.S. 302, 315 (1986); see also Hakeem v. Beyer, 990 F.2d 750, 763 (3d Cir. 1993) (stating "[g]eneral allegations that witnesses' memories have faded are insufficient to create prejudice, at least absent extreme delay such as eight and one-half years, or the special circumstances that existed in Doggett"). Further, Petitioner's contention that the particular length of delay in this case caused R.M.'s uncertainty as to the timing of his sexual encounter with the victim amounts to sheer speculation. No evidence exists in the record that R.M. ever could have given a reliable report of when he had sex with the victim.[11]

Even more significantly, despite knowing of the pending charges against him during the entire four and a half year delay, Petitioner does not claim to have taken any steps to memorialize

---

[11] Put another way, a review of R.M.'s above-quoted voir dire does not suggest that, even with a much shorter delay, R.M. could have given unequivocal testimony about date-sensitive matters. Such questions simply seemed beyond his capacity.

R.M.'s account (or to cause such action).  That fact seriously undermines Petitioner's assertion of unfair prejudice.  See Hakeem, 990 F.2d at 764 (finding no prejudice from witnesses adversely impacted by delay where the petitioner "knew from the day of the robbery that it would be necessary to preserve his alibi" and distinguishing Doggett where the petitioner "appear[ed] to have been unaware of the charges pending and so had no reason to prepare a defense"); United States ex rel. Spina v. McQuillan, 525 F.2d 813, 818 (2d Cir. 1975) (recognizing no prejudice regarding witnesses missing due to delay where the petitioner "remained at liberty on his own recognizance . . . [and] never contended that he was prevented in any way from locating or keeping in touch with witnesses").

Regarding adverse financial consequences, unlike criminal defendants detained during an extended pretrial period, Petitioner made bond after just ten days in jail (see Docket Entry 6-10 at 30) and remained employed, albeit at a reduced income, through the date of his trial (see Docket Entry 6-20 at 58-60).  Thus, Petitioner here cannot identify "'any . . . disruption of employment . . . [or] strain on financial resources' that was greater than that faced by 'anyone openly subject to criminal investigation.'" United States v. Hall, 551 F.3d 257, 272 (4th Cir. 2009) (quoting United States v. MacDonald, 456 U.S. 1, 9 (1982)).  Moreover, Petitioner's arrest for sex crimes, rather than any post-arrest delay, likely caused the Air Force to take the modest steps described, a fact which undercuts any prejudice claim.  See

McQuillan, 525 F.2d at 818 (concluding that the petitioner's "various claims that he was prejudiced by the delay between indictment and trial . . . [were] attributable to the fact of indictment itself rather than to the delay (e.g., loss of his job as a police detective, denial of positions because of inability to be bonded)"); United States v. Netterville, 553 F.2d 903, 916 (5th Cir. 1977) ("[The petitioner] claims to have lost his job and to have been unable to secure another [and] to have suffered severe financial hardship . . . as a result of his indictment. These are complaints of the sort present to some degree in virtually every case and do not necessarily amount to actual prejudice, because they are the result of the indictment itself and not of the delay which followed the indictment."). To the degree some financial hardship not caused by the delay worsened with delay, Petitioner has not shown sufficient financial hardship arising directly from the delay to tip the prejudice scales of Barker in his favor, particularly given that, unlike many defendants, he retained employment pending his trial.

Finally, to the extent Petitioner suffered anxiety and marital trouble during the delay, such difficulties did not rise to a level sufficient to cause Petitioner to insist that his counsel pursue a speedy trial motion. That fact diminishes significantly Petitioner's effort to predicate prejudice on such grounds. See Government of Virgin Islands v. Pemberton, 813 F.2d 626, 630 (3d Cir. 1987) (noting "we cannot ignore the fact that the acute anxiety [the petitioner] now claims he was suffering did not induce

him to make some inquiry of the government or the court as to the status of the proceedings"); Mills v. Shepherd, 445 F. Supp. 1231, 1235 (W.D.N.C. 1978) (observing that "[w]hatever mental anguish [the] petitioner suffered as a result of the delay did not have such an impact that he sought a speedy trial and there is no evidence that he requested his attorney to seek one").  Moreover, at trial, Petitioner testified that he remained married to his wife of 12 and a half years and that he and his wife had welcomed a daughter during the time between his arrest and trial.  (See Docket Entry 6-20 at 59 (documenting testimony on January 21, 2009, that youngest child had "just turned three," indicating child's birth occurred in late 2005 or early 2006)).  Simply put, the record does not reflect the type of anxiety necessary to demonstrate Barker prejudice.  See United States v. Goodson, 204 F.3d 508, 516 (4th Cir. 2000) (quoting United States v. Shepherd, 511 F.2d 119, 123 (5th Cir. 1975), for the proposition "that prejudice from anxiety requires 'more than the normal anxiety that accompanies a trial'").

On balance, the Barker factors do not compel a finding that Petitioner suffered a violation of his right to a speedy trial.  In other words, one can make a "reasonable argument that [Petitioner's trial] counsel satisfied Strickland's deferential standard," Harrington, 526 U.S. at ___, 131 S. Ct. at 788, when he declined to raise any speedy trial claim and/or that any such challenge would have failed.  As such, the MAR court reasonably applied Strickland in ruling against Petitioner on his instant ineffective assistance

of counsel claim.  Consequently, Petitioner cannot obtain federal habeas relief under Section 2254(d).

### V.  CONCLUSION

Petitioner's habeas claims all fail as a matter of law.

**IT IS THEREFORE ORDERED** that Respondent's Motion for Summary Judgment (Docket Entry 5) be granted, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.


                            /s/ L. Patrick Auld
                            **L. Patrick Auld**
                   **United States Magistrate Judge**

October 10, 2014